FILED
CLERK

8/15/2016 11:15 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
VICKI L. CONFORTI,

                Plaintiff,

        -against-

SUNBELT RENTALS, INC., ON SITE
ENERGY COMPANY, INC., IRVIN L.
FRENCH, IRVIN M. FRENCH, PATRICK
FRENCH, and KYLE HORGAN,

                    Defendants.
--------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
15-cv-5045 (ADS)(GRB)

**APPEARANCES:**

**Dandeneau & Lott**
*Attorneys for the Plaintiff*
425 Broad Hollow Road, Suite 418
Melville, NY 11747
      By: Gerald V. Dandeneau, Esq.
         Dawn A. Lott, Esq., Of Counsel

**Smith, Gambrell & Russell, LLP**
*Attorneys for the Defendants Sunbelt, Irvin M. French, Patrick French, and Kyle Horgan*
50 N Laura Street, Suite 2600
Jacksonville, FL 32202
      By: Yash B. Dave, Esq.
         Patricia J. Hill, Esq., Of Counsel

**Forchelli Curto Deegan Schwartz Mineo & Terrana, LLP**
*Attorneys for the Defendants On Site, Irvin L. French, Irvin M. French, and Patrick French*
333 Earle Ovington Blvd, Suite 1010
Uniondale, NY 11553
      By: Gregory Scot Lisi, Esq.
         Lauren Kantor Lipnick, Esq.
         Elbert Nasis, Esq., Of Counsel

**SPATT, District Judge**.

      This case arises from allegations by the Plaintiff Vicki L. Conforti (the "Plaintiff") that

from 2005 to 2014, while she was employed by the Defendants Sunbelt Rentals, Inc. ("Sunbelt")

and On Site Energy Company, Inc. ("On Site"), her supervisors discriminated against her on the

1

basis of her gender, subjected her to a hostile work environment, and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL").

Presently before the Court are two separate motions pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) by the Defendants Sunbelt, On Site, Irvin L. French, Irvin M. French, Patrick French, and Kyle Horgan (collectively, the "Defendants") to dismiss the complaint. Also before the Court is a cross-motion pursuant to Rule 15 by the Plaintiff for leave to file an amended complaint.

For the reasons set forth below, the Defendants' motions to dismiss are granted in part and denied in part; and the Plaintiff's cross-motion to amend the complaint is granted in part and denied in part.

## I. BACKGROUND

As described in more detail below, the standard applied to motions to dismiss is the same as the standard applied to addressing the sufficiency of a plaintiff's proposed amended complaint. Here, the Plaintiff cross-moved to file an amended complaint in response to the Defendants' motions to dismiss. For the purpose of procedural efficiency, courts in similar situations often treat the proposed amended complaint as the operative pleading and construe a defendant's motion to dismiss as addressed to the amended complaint. The Court adopts that approach here. Therefore, the following facts are drawn from the proposed amended complaint ("PAC") unless otherwise stated.

### A. As to the Facts

The Plaintiff is a female who resides in Suffolk County, New York. (PAC, Dkt. No. 23-2 ["PAC"], at ¶¶ 6–7.)

The Defendant Sunbelt is a foreign corporation that conducts business in New York. (Id. at ¶ 10.) It is a national equipment rental company, and its headquarters are located in North Carolina. (Id. at ¶ 48.)

The Defendant On Site is a New York company with its principal place of business in New York. (Id. at ¶ 8.) It is a "rental company that offers generators, cooling and heating equipment to industrial, commercial and private markets." (Id. at ¶ 23.)

In July 2001, On Site hired the Plaintiff as a bookkeeper. At that time, the Defendant Irvin L. French owned On Site. (Id. at ¶ 25.) Irvin M. French is the son of Irvin L. French, and from 2001 to 2014, he was the Vice President of On Site's Service Department. (Id.) The complaint refers to Irvin M. French as "Mike French." Accordingly, for ease of reference, the Court will do the same here.

From 2001 to 2014, Patrick French, also a son of Irvin L. French, was the Vice President of On Site's Sales Department. (Id.) During that period, the other management-level employees at On Site included Joe Meola, the Vice President of Finance; Richard Krause, the Service Manager; and Steven Corvaia, the Fleet Coordinator. (Id. at ¶ 26.)

For her entire tenure at On Site, the Plaintiff was the only female management-level employee even though, allegedly, there were women who applied for and were qualified for management positions. (Id. at ¶ 31.)

In 2005, the Plaintiff was promoted from bookkeeper to Controller of the entire company. (Id. at ¶ 28.) In that role, she oversaw financial and personnel matters. (Id.) She also supervised seven employees in the accounting, customer service, and administrative departments. (Id.) However, according to the Plaintiff, male employees were not required to report to her. (Id. at ¶ 29.)

The complaint further states that all female employees at On Site earned less compensation than male employees; were offered fewer benefits than male employees; and unlike their male counterparts, were not permitted to seek reimbursement for corporate expenses, nor invited to annual company outings and networking events.  (Id. at ¶¶ 38–42.)

The Plaintiff further alleges that "[m]ale management-level employees such as [Irvin L.] French, Mike French, Pat French, Joe Meola, Steve Corvaia and Richard Krause repeatedly stated throughout the Plaintiff's tenure [that] a female's place is behind that of men."  (Id. at ¶ 35.)  Also on several occasions, Irvin L. French allegedly stated that he "never wanted too many female employees[] because they were excessively emotional and moody."  (Id. at ¶ 37.)  It is not clear from the complaint when or to whom these statements were made.

Allegedly at an unspecified time, Irvin L. French ordered female strippers to come to On Site's offices during work hours.  (Id. at ¶ 46.)  Other "management employees" also sexually propositioned female employees and viewed pornographic materials during the work day.  (Id.)

The PAC also states that On Site's management failed to implement policies and procedures to deter sexual harassment and discrimination.  (Id. at ¶ 47.)  For example, allegedly, in response to a complaint of harassment from one of the Plaintiff's female co-workers, Irvin L. French, Mike French, and Patrick French failed to take disciplinary or remedial actions against the male culprit and fired the female employee.  (Id. at ¶ 47.)

In April 2014, Sunbelt acquired On Site.  (Id. at ¶ 49.)  As part of the acquisition, Sunbelt initially made the decision to retain all of On Site's employees, including the Plaintiff.  (Id. at ¶¶ 49, 53.)  In addition, On Site apparently agreed to continue paying certain expenses on behalf of Sunbelt, including, union dues for employees hired by Sunbelt; rent for the New Jersey branch

office of Sunbelt; and the salary and health insurance premiums for Dennis French and Joe Meola. (Id. at ¶ 59.)

Following the acquisition, the Plaintiff's title changed from Controller to Assistant Manager for a department named "PC 104." (Id. at ¶ 55.) The complaint does not specify what PC 104 is or what its role was inside Sunbelt. (Id.) As part of her change in title, the Plaintiff received a salary increase of $3,000, which was allegedly significantly less than the raises that her male counterparts received. (Id.)

In her new role as Assistant Manager of PC 104, the Plaintiff was responsible for, among other things, overseeing the operations of PC 104; reviewing daily contracts; assessing and modifying sales plans; ensuring compliance with company policies and requirements; reviewing the company's debt collection efforts; and inspecting the PC 104 yard. (Id. at ¶ 56.) She reported directly to Mike French and indirectly to Irvin L. French and Joe Meola. (Id. at ¶ 57.)

Immediately after becoming Assistant Manager, the Plaintiff alleges that Mike French, Patrick French, Joe Meola, Richard Krause, and Steve Corvaia denied her access to the codes necessary for her to perform her job duties; excluded her from one-on-one training sessions that male employees were permitted to attend; and failed to invite her to monthly management meetings. (Id. at ¶¶ 73–80.) In particular, she alleges that she was not invited to an April 8, 2014 meeting to discuss the organizational structure of PC 104. (Id. ¶ 82.)

At an unspecified time, the Plaintiff made recommendations to the Service Department to make changes to their daily activities. (Id. at ¶ 91.) Apparently, the Plaintiff's supervisors reprimanded the Plaintiff for making the recommendations and refused to consider them. (Id.)

In May 2014, the Plaintiff authorized a $2,000 transaction for a Sunbelt client. (Id. at ¶ 92.) Allegedly, Richard Krause, another male management level employee at Sunbelt,

"overruled the Plaintiff's decision in front of the entire all-male sales teams and other managers."
(Id.)  On another occasion, Krause apparently tore down an expense chart that the Plaintiff had
prepared for a meeting of Service Department employees.  (Id. at ¶ 94.)  Subsequently, the
Plaintiff complained to Robert Smith, another management employee at Sunbelt, about the
incidents.  (Id. at ¶ 93.)  Allegedly Smith responded, "[W]hatever Mike French or Richard
Krause says, goes."  (Id. at ¶ 93.)

Also in May 2014, the Plaintiff met with Mike French and Patrick French.  (Id. at ¶ 87.)
During the meeting, Mike French and Patrick French mocked the Plaintiff's authority as
Assistant Manager by telling her that her title was too powerful for a female.  (Id. at ¶ 87.)  They
also suggested that the Plaintiff take an administrative position or seek employment elsewhere;
described her as a "floppy disc"; and warned her that she would "crash and burn like a
helicopter" if she continued to work as an Assistant Manager. (Id.)

Subsequently, the Plaintiff informed Kyle Horgan about the May 2014 meeting with
Mike and Patrick French, as well as what she perceived to be a department-wide bias against
female employees.  (Id. at ¶ 98.)  During a follow-up phone conversation, Horgan advised the
Plaintiff that Mike and Patrick French disputed her account of the May 2014 meeting.  (Id. at ¶
100.)  Allegedly, Horgan also told the Plaintiff that she was "being too aggressive and
overreacting" and suggested the she "should assume the submissive role expected of females and
play nicely within the boys' club."  (Id.)

Following the meeting with Horgan, the Defendants decided to relocate the Plaintiff's
desk from a lower floor to an upstairs floor that was isolated from other employees in the PC 104
group.  (Id. at ¶ 108.)  Also, Mike French and Patrick French stripped the Plaintiff of her
supervisory responsibility over daily reports and regularly taunted her in front of other

employees.  (Id. at ¶¶ 109, 113.)  As one example, the PAC states that they assigned ring tones to the Plaintiff's phone number so that when she called one of them, instead of a ring, their phones would emit the sounds of "missiles, old car horns, and dogs barking."  (Id. at ¶ 111.)

At some time prior to June 20, 2014, the Plaintiff attended a trade show with Mike French, who allegedly told the Plaintiff that he was "disgust[ed] with the idea that one of their clients could have a female top executive running the company" and stated that "it must be difficult for a male to report to a female."  (Id. at ¶ 115.)

On June 20, 2014, Mike French met with the Plaintiff and informed her that she had to leave the company by July 18, 2014.  (Id. at ¶ 114.)

The PAC also alleges that Sunbelt discriminated against female employees other than the Plaintiff.  Specifically, the PAC states that Sunbelt excluded female employees from the second half of a driver training program; failed to give female employees their uniforms; and classified unnamed female employees as administrative assistants even though they performed work that exceeded administrative functions. (Id. at ¶ 78–79, 84.)

In addition to firing the Plaintiff, from May 2014 to July 2014, Sunbelt allegedly also fired four other female employees in the PC 104 Department and delegated their job duties to male employees.  (Id. at ¶ 62–68.)  During this same period, Sunbelt did not terminate any male employees.  (Id. at ¶ 71.)  The PAC alleges "upon information and belief" that Irvin L. French, Mike French, Patrick French, Joe Meola, and Kyle Horgan were involved in the decisions to terminate the female employees.  (Id. at ¶ 72.)

**B. As to the Procedural History**

On November 17, 2014, the Plaintiff filed a verified complaint against Sunbelt and On Site (collectively, the "Corporate Defendants") with the New York State Division of Human

Rights ("NYSDHR") alleging sex discrimination and retaliation. (See The Sunbelt Defs.' Mot. to Dismiss, Dkt. No. 10 ["The Sunbelt Defs.' Mot. to Dismiss"], at Ex. A.) She also cross-filed the complaint with the U.S. Equal Opportunity Commission ("EEOC"). (See id. at p. 7.)

On October 23, 2015, the NYSDHR dismissed the Plaintiff's charge because it found that there was no probable cause to believe that the Corporate Defendants engaged in any unlawful discriminatory practices. (Id. at Ex. B.)

On June 16, 2015, the EEOC adopted the NYSDHR's findings; dismissed the Plaintiff's charge; and notified the Plaintiff of her right to sue. (See id. at Ex. C.)

On August 28, 2015, the Plaintiff timely commenced this action by filing a complaint against the Defendants. The Plaintiff asserted (i) a claim under Title VII for gender discrimination and the creation of a hostile work environment; (ii) a claim under the NYSHRL for gender discrimination; (iii) a claim under Title VII and the NYSHRL for retaliation; (iv) a claim for intentional infliction of emotional distress; and (v) and a claim for negligent infliction of emotional distress. (See the Orig. Compl., Dkt. No. 1 ["Orig. Compl."], at ¶¶ 95–129.)

On October 23, 2015, the Defendants Sunbelt, Mike French, Patrick French, and Kyle Horgan (together, the "Sunbelt Defendants") filed a Rule 12(b)(6) motion to dismiss the complaint. In their memorandum, the Sunbelt Defendants argued that the Title VII claims against the Defendants Irvin L. French, Mike French, Patrick French, and Kyle Horgan (together, the "Individual Defendants") should be dismissed because Title VII does not provide for individual liability. (See the Sunbelt Defs.' Mot. to Dismiss at 7–8.) They further contended that the only adverse employment action that the Plaintiff sufficiently alleged was her termination, and the allegations in the complaint failed to give rise to the plausible inference that her gender was a motivating factor in her termination, or that her termination was plausibly

linked to any protected activity. (See the Sunbelt Defs.' Mot. to Dismiss at 7–8, 12–14.) They also asserted that the complaint failed to allege the kind of objectively severe and pervasive conduct required to state a claim for a hostile work environment under Title VII. (Id. at 12–13.)

With regard to the Plaintiffs' state law claims, the Sunbelt Defendants contended that the Plaintiff's NYSHRL claims for sex discrimination and retaliation were barred by the statute's election of remedies provision; the Plaintiffs' intentional infliction of emotion distress claim was time barred; and the allegations in the complaint were insufficient to plausibly allege claims for intentional or negligent infliction of emotion distress. (See id. at 14–18.)

On November 30, 2015, the Defendants On Site, Irvin L. French, Mike French, and Patrick French (collectively, the "On Site Defendants") filed a separate Rule 12(b)(6) motion to dismiss the complaint, which incorporated many of the same arguments made by the Sunbelt Defendants. However, unlike the Sunbelt Defendants, the On Site Defendants argued that the Plaintiff was employed by Sunbelt, not On Site, at the time of her termination, and therefore, all of the Plaintiffs' discrimination claims against On Site failed as a matter of law. (See the On Site Defs.' Mot. to Dismiss, Dkt. No. 19 [the "On Site Defs.' Mot. to Dismiss"], at 6–8.)

In response, on December 28, 2015, the Plaintiff filed a memorandum in opposition to the Defendants' Rule 12(b)(6) motions and a cross motion pursuant to Rule 15 for leave to file an amended complaint. (See the Pl.'s Cross Mot., Dkt. No. 23 [the "Pl.'s Cross Mot."].) In support of her cross motion, the Plaintiff attached the PAC and her own sworn affidavit. (See id.) Of importance, the PAC removed the state law claims that she asserted in her original complaint — namely, the NYSHRL discrimination claims and the claims for intentional infliction of emotional district and negligent infliction of emotional distress. (See PAC at ¶¶ 124–129.)

In her memorandum of law, the Plaintiff argued that the PAC stated plausible claims for Title VII gender discrimination, retaliation, and hostile work environment, and therefore, leave to amend should not be denied on the ground of futility. (See the Pl.'s Cross Mot. at 8–19.) She also claimed that On Site could be held liable for the actions of Sunbelt under the single employer doctrine. (Id. at 8–10.)

On January 14, 2016, and January 15, 2016, respectively, the Sunbelt Defendants and the On Site Defendants filed separate reply memoranda in support of their motions to dismiss and in opposition to the Plaintiff's motion to amend. In their papers, they argued that the PAC failed to cure the deficiencies in the original complaint. (See the Sunbelt Defs.' Reply Mem. of Law, Dkt. No. 23 [the "Sunbelt Defs.' Reply Mem. of Law"]; the On Site Defs.' Reply Mem. of Law, Dkt. No. 25 [the "On Site Defs.' Reply Mem. of Law"].)

On January 28, 2016, the Plaintiff filed a reply memorandum in support of her cross-motion to amend, reiterating her contention that the PAC plausibly stated Title VII claims against the Corporate Defendants for gender discrimination, retaliation, and hostile work environment. (See the Pl.'s Reply Mem. of Law, Dkt. No. 26 [the "Pl.'s Reply Mem. of Law"].)

Below, the Court will address the applicable legal standards and the sufficiency of each of the Plaintiffs' claims.

## II. DISCUSSION

### A. As to the Legal Standards

#### 1. Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss complaint that "fail[s] to state a claim upon which relief can be granted." When ruling on such a motion, the court "'accept[s] all allegations in the complaint as true and draw all inferences in the non-moving

party's favor.'" <u>LaFaro v. New York Cardiothoracic Grp., PLLC</u>, 570 F.3d 471, 475 (2d Cir. 2009) (quoting <u>Miller v. Wolpoff & Abramson, L.L.P.</u>, 321 F.3d 292, 300 (2d Cir. 2003)).

However, to survive a 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citation omitted). Thus, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." <u>Twombly</u>, 550 U.S. at 570 (citation omitted); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) ("[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted). Accordingly, unless plaintiffs' well-pleaded allegations have "nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." <u>Twombly</u>, 550 U.S. at 569.

In considering a motion to dismiss, a court is generally "limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007) (citing <u>Taylor v. Vt. Dep't of Educ.</u>, 313 F.3d 768, 776 (2d Cir. 2002)).

"[W]here matter outside the pleadings is offered and not excluded by the trial court, the motion to dismiss should be converted to a motion for summary judgment." <u>Nakahata v. New</u>

York-Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 202 (2d Cir. 2013) (citing Fed. R. Civ. P. 12(d)). "However, a district court is not obliged to convert a 12(b)(6) motion to one for summary judgment in every case in which a defendant seeks to rely on matters outside the complaint in support of a 12(b)(6) motion; it may, at its discretion, exclude the extraneous material and construe the motion as one under Rule 12(b)(6)." United States v. Int'l Longshoremen's Ass'n, 518 F. Supp. 2d 422, 450 (E.D.N.Y. 2007) (collecting cases); see also Rice v. Kawasaki Heavy Indus., Ltd., No. CV07-4031(SJF)(ARL), 2008 WL 4646184, at *3 (E.D.N.Y. Oct. 17, 2008) ("Rather than convert the Kawasaki defendants' Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, see Rule 12(d), I instead exercise my discretion to exclude the extraneous material submitted by the Kawasaki defendants on their motion and decide their motion on the complaint alone.").

The Court notes that in opposition to the Defendants' motions to dismiss and in support of her cross motion to amend her complaint, the Plaintiff filed her own ten page declaration attesting to various purported facts regarding the alleged discriminatory acts of the Defendants. (See Conforti Decl., Dkt. No. 23-3.) This declaration was not attached to or referred to in the original complaint. Rather, the Plaintiff attached the declaration to her legal memorandum for the sole purpose of withstanding the Defendants' motions to dismiss her claims.

For these reasons, rather than to *sua sponte* convert the Defendants' motions into summary judgment motions, the Court, in its discretion, excludes the declaration offered by the Plaintiff in support of her legal memorandum and decides the parties' Rule 12 and Rule 15 motions on the basis of the complaint and the PAC alone. See N. Shipping Funds I, LLC v. Icon Capital Corp., 921 F. Supp. 2d 94, 100–01 (S.D.N.Y. 2013) ("I decline to convert this motion

into one for summary judgment. Therefore, . . ., I exclude from consideration the additional materials submitted by the parties."); <u>Toussie v. Town Bd. of Town of E. Hampton</u>, No. CIVA 08-1922 (DRH) (WDW), 2010 WL 597469, at *3 (E.D.N.Y. Feb. 17, 2010) ("At this stage in the litigation, the Court declines to convert Defendants' Rule 12(b)(6) motion into one for summary judgment given that discovery has not been completed and an Answer has not been filed.").

**2. Rule 15**

Rule 15(a)(1) states that "[a] party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

Here, it is undisputed that the Plaintiff did not file an amended complaint within 21 days after serving it on the Defendants, or within 21 days after the service of the Defendants' two motions to dismiss. Thus, Rule 15(a)(2) governs her proposed amendments.

That provision states, "[A] party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2) (alteration added). The Rule further states that "[t]he court should freely give leave when justice so requires." <u>See</u> Fed. R. Civ. P. 15(a)(2).

Interpreting this latter provision, the Second Circuit has stated that only "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment' will serve to prevent an amendment prior to trial.'" <u>Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 87 (2d Cir. 2002) (alterations in original) (quoting <u>Foman v. Davis</u>, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L.Ed.2d 222 (1962)). "An

amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Id.

"Where a plaintiff seeks to amend his complaint while a motion to dismiss is pending, a court 'has a variety of ways in which it may deal with the pending motion to dismiss, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." Hamzik v. Office for People with Developmental Disabilities, 859 F. Supp. 2d 265, 273–74 (N.D.N.Y. 2012) (quoting Roller Bearing Co. of Am., Inc. v. Am. Software, Inc., 570 F.Supp.2d 376, 384 (D. Conn. 2008)); see also Saye v. First Specialty Ins. Co., No. 14-CV-5946 (JG) (LB), 2015 WL 1737949, at *3 (E.D.N.Y. Apr. 16, 2015) (same); Levantino v. Skala, 56 F. Supp. 3d 191, 195 (E.D.N.Y. 2014) (Spatt, J) (same).

Here, the PAC does not add new claims or parties, nor does it drastically change the allegations in the original complaint. The Defendants make many of the same arguments in opposing the Plaintiff's motion to amend that they did in support of their original motions to dismiss. Further, as noted above, the Court will apply the same standard in assessing whether the proposed amendments in the PAC would be futile that it would apply in assessing whether the original complaint meets the Rule 12(b)(6) standard. See Levantino, 56 F. Supp. 3d at 195 ("As each claim in the proposed amended complaint must be examined under a 12(b)(6) analysis in any event, the Court exercises its discretion to deny the motion to dismiss as moot. Further, the Court grants in part and denies in part the Plaintiff's cross-motion to amend the complaint.").

Therefore, for the purpose of procedural efficiency, the Court, in its discretion, considers the Defendants' sufficiency arguments, along with their futility arguments, in light of the PAC. So that "'if the proposed amended complaint cannot survive the motion to dismiss, then plaintiffs' cross-motion to amend will be denied as futile.'" Schwartzco Enterprises LLC v.

<u>TMH Mgmt., LLC</u>, 60 F. Supp. 3d 331, 338–39 (E.D.N.Y. 2014) (Spatt, J) (quoting <u>Haag v.</u>

<u>MVP Health Care</u>, 866 F. Supp. 2d 137, 140 (N.D.N.Y. 2012)).

**B. As to the State Law Claims**

As noted earlier, in her original complaint, the Plaintiff asserted discrimination claims

under the NYSHRL, as well as claims for intentional and negligent infliction of emotional

distress. (<u>See</u> the Orig. Compl. at ¶¶ 95–129.)

In their original motions to dismiss, the Defendants argued that these claims failed as a

matter of law because the NYSHRL was barred by the statute's election of remedies provision;

the intentional infliction of emotion distress claim was untimely; and the allegations failed to

plausibly state claims for intentional or negligent infliction of emotional distress. (<u>See</u> the

Sunbelt Defs.' Mot. to Dismiss at 14–19; the On Sit Defs.' Mot. to Dismiss at 18–20.)

In her memorandum in opposition to the Defendants' Rule 12(b)(6) motions and in

support of her Rule 15 motion, the Plaintiff did not address any of these arguments. Instead, she

focused solely on her Title VII claims against the Corporate Defendants. (<u>See</u> the Pl.'s Cross

Mot. at 11–19.) Furthermore, although there are several references in the opening paragraph of

the PAC to the NYSHRL, the PAC does not contain separate causes of action for discrimination

under the NYSHRL, intentional emotional distress, or negligent emotional distress. (<u>See</u> PAC at

¶¶ 124–144.)

Under these circumstances, the Court deems the Plaintiffs' state law claims abandoned;

grants the Defendants' motion to dismiss those claims; and denies as futile the Plaintiff's motion

to amend her complaint to add such claims. <u>See</u> <u>Jackson v. Fed. Exp.</u>, 766 F.3d 189, 196 (2d

Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may

be fairly drawn from the papers and circumstances viewed as a whole, district courts may

conclude that abandonment was intended."); Robinson v. Fischer, No. 09 CIV. 8882 (LAK) (AJP), 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim.") (collecting cases).

## C. As to the Title VII Claims Against the Individual Defendants

In support of their motions to dismiss, the Defendants asserted that the Plaintiff's Title VII claims against the Individual Defendants failed as a matter of law because Title VII does not provide for individual liability. (See the Sunbelt Defs.' Mot. to Dismiss at 6; the On Site Defs.' Mot. to Dismiss at 6.)

Again, the Plaintiff did not address this argument in her memorandum in opposition to the Defendants' motion, or in support of her motion to amend. (See the Pl.'s Mot. to Amend at 11–19.) In addition, the Court notes that the Defendants are correct that it is well-established that individuals are not subject to individual liability under Title VII. See Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004) ("'[I]ndividuals are not subject to liability under Title VII.' . . . . Accordingly, the district court properly dismissed Patterson's Title VII claims against the individual defendants.") (quoting Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir.2000) (per curiam)); see also Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir.1995) ("[I]ndividual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"), *abrogated on other grounds by* Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L.Ed.2d 633 (1998)).

Therefore, the Court grants the Defendants' motion to dismiss the Title VII claims against the Individual Defendants and denies the Plaintiff's motion for leave to file an amended

complaint that contains Title VII claims against the Individual Defendants. Thus, the only remaining claims in this action are the Title VII claims against the Corporate Defendants.

### D. As to the Title VII Gender Discrimination Claim

In the PAC, the Plaintiff asserts a claim under Title VII for gender discrimination because she alleges that she was treated differently than her male colleagues on the basis of her gender, endured harassment on the basis of her gender, and her gender was a substantial or motivating factor in Sunbelt's decision to terminate her employment on July 18, 2014.  (See PAC at ¶¶ 124–138.)

"[T]o defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015).

In the present case, both On Site and Sunbelt assert that the only adverse employment action alleged in the PAC is the termination of the Plaintiff's employment at Sunbelt.  (See the Sunbelt Defs.' Reply Mem. of Law at 3–5; the On Site Defs.' Reply Mem. of Law at 4–11.) They also both claim that the PAC fails to plausibly allege that the Plaintiff's gender was a motivating factor in the decision to terminate her.  (See id.)  In addition, On Site contends that it cannot be held liable even if the Plaintiff's termination was discriminatory because the Plaintiff was not employed by On Site at the time of her termination.  (See the On Site Defs.' Reply Mem. of Law at 4–11.)

The Plaintiff asserts that the PAC does allege adverse actions in addition to her termination and sufficiently alleges that her gender was a motivating factor in the Corporate Defendants' actions.  (See the Pl.'s Cross. Mot. at 11–16.)  She also alleges that On Site and

Sunbelt are jointly liable for the acts of Sunbelt under the "single employer doctrine." (Id. at 8–11.)

### 1. The Legal Standards

#### a. Adverse Employment Action

As noted, the first element that a plaintiff must prove to allege a Title VII claim is that he or she suffered a material adverse employment action. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.'" Vega, 801 F.3d at 85 (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Galabya, 202 F.3d at 640 (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)). For the purpose of Title VII discrimination claims, the Second Circuit has stated, "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Galabya, 202 F.3d at 640).

As relevant here, a reassignment or changes in job responsibilities, by themselves, do not constitute adverse employment actions. Rather, a plaintiff must plausibly allege that an employer's actions gave rise to material adverse changes in his or her work conditions. For example, in Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72 (2d Cir. 2015), the Second Circuit found that allegations that a school district reassigned a teacher to classes with increased number of Spanish-speaking students could plausibly constitute an adverse employment because

the teacher alleged that "he was forced to spend disproportionately more time preparing for his classes and therefore experienced a material increase in his responsibilities without additional compensation." Id. at 88.

By contrast, in Chung v. City Univ. of New York, 605 F. App'x 21 (2d Cir. 2015) (Summary Order), the plaintiff alleged a race discrimination claim against his former employer arising from allegations that he received a negative performance review; was required to perform certain low level tasks that fell outside of his job responsibilities; was denied access to relevant computer programs; and was excluded from at least two staff meetings and five other meetings of student assistants. Id. at 21. In a summary order, the Second Circuit found that the district court correctly concluded these allegations failed to plausibly show the plaintiff suffered an adverse employment action. Id. The court reasoned that "with the exception of the negative performance evaluation and the staff meetings, none of the allegations describes a substantial departure from the state of affairs at the outset of the limitations period." Id. at 22. The circuit court further found that a negative performance review was, standing alone, not sufficient to allege an adverse employment action because "the proposed amended complaint alleges no tangible consequences resulting from the evaluation." Id.

Similarly, in Carpenter v. City of Mount Vernon, No. 15-CV-0661 (NSR), 2016 WL 4059353, at *6 (S.D.N.Y. July 27, 2016), the district court found that an allegation that a plaintiff-police officer was ordered by her supervisors to work outside of police headquarters did not plausible allege an adverse employment action because the plaintiff failed to allege that the decision resulted in any "negative consequences." Id.; see also See Christiansen v. Omnicom Grp., Inc., No. 15 CIV. 3440 (KPF), 2016 WL 951581, at *10 (S.D.N.Y. Mar. 9, 2016) ("The mere offering of a severance package to [p]laintiff does not itself constitute an adverse

employment action, in light of the fact that Plaintiff alleges no negative consequences arising from his refusal to leave DDB."); Sank v. City Univ. of New York, No. 10 CIV. 4975, 2011 WL 5120668, at *9 (S.D.N.Y. Oct. 28, 2011) (finding that the plaintiff's loss of adequate storage space did not plausibly allege an adverse employment action because "the Complaint does not contain a single allegation that [the plaintiff] suffered any diminution in title, seniority, salary or other tangible benefits as a consequence of this decision").

### b. Inference of Discrimination

"The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason." Stratton v. Dep't for the Aging for City of New York, 132 F.3d 869, 878 (2d Cir. 1997) (citing Fields v. New York State Office of Mental Retardation & Dev. Disabilities, 115 F.3d 116, 119 (2d Cir. 1997)). "A plaintiff can meet that burden through direct evidence of intent to discriminate . . . or by indirectly showing circumstances giving rise to an inference of discrimination." Vega, 801 F.3d at 87 (internal citations omitted). For example, "[a]n inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Littlejohn, 795 F.3d at 312 (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)). The plaintiff may also prove discrimination by "creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." Vega, 801 F.3d at 87.

Whatever category or combination of categories of evidence a plaintiff relies on to allege a discrimination claim, the Second Circuit has made clear that "at the initial stage of a litigation, the plaintiff's burden is 'minimal' — he need only plausibly allege facts that provide 'at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" Id. (quoting Littlejohn, 795 F.3d at 311). Thus, in making the plausibility determination, a district court "must be mindful of the 'elusive' nature of intentional discrimination" and that "rarely is there 'direct, smoking gun, evidence of discrimination.'" Id. (internal quotation marks and citations omitted).

For example, in Littlejohn v. City of New York, *supra*, the Second Circuit found that a district court erred in granting a Rule 12(b)(6) motion to dismiss a Title VII race discrimination claim. 795 F.3d at 313. There, the plaintiff alleged that she was demoted and replaced by a white employee with less experience. Id. The circuit court found that these factual allegations were "more than sufficient to make plausible her claim that her demotion occurred under circumstances giving rise to an inference of discrimination." Id.

Similarly, in Vega v. Hempstead Union Free Sch. Dist., *supra*, the Second Circuit found that a district court erred in finding that a complaint failed to plausibly allege a race discrimination claim by a Hispanic teacher against his employer, a school district. 801 F.3d at 88. The complaint alleged that the plaintiff was assigned a large percentage of Hispanic speaking students, while his similarly situated non-Hispanic co-workers were not assigned such work. Id. at 88–89. Construing this allegation as true, the circuit court found that the complaint plausibly alleged that the plaintiff's Hispanic background was a motivating factor in the district's decision to assign him extra work when viewed in the context of other alleged actions taken by the district — such as, placing a University of Puerto Rico sign outside of his classroom and

attempting to transfer him to a Hispanic principal's school —, which were "plausibly connected to the plaintiff's Hispanic background." Id. at 89.

### c. The Single Employer Doctrine

Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "Consequently, the existence of an employer-employee relationship is a primary element of Title VII claims." Gulino v. New York State Educ. Dep't, 460 F.3d 361, 370 (2d Cir. 2006). "Although Title VII provides definitions of both 'employer' and 'employee,' neither definition is particularly helpful in deciding whether an employment relationship exists." Id.

The Supreme Court has filled in the interpretative gap by referring to principles of common law agency. See Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 739–40, 109 S. Ct. 2166, 2172, 104 L. Ed. 2d 811 (1989) ("In the past, when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.").

Relevant here, "[t]o prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other.'" Brown v. Daikin Am. Inc., 756 F.3d 219, 226 (2d Cir. 2014) (quoting Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000)). To determine whether a parent company can be liable for the conduct of a subsidiary, this Circuit has adopted the "single-employer' test. Id. (citing Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235 (2d Cir. 1995)) Under that test, "[a] parent and

subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." Id. (citation and internal quotation marks omitted).

No one factor is determinative; however, the Second Circuit has stated that the second factor, centralized control of labor relations, "is the central concern." Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996). To satisfy this factor, "a plaintiff need not allege that the parent exercises 'total control or ultimate authority over hiring decisions,' so long as he alleges that there is 'an amount of participation [by the parent] that is sufficient and necessary to the total employment process." Brown, 756 F.3d at 227 (quoting Cook, 69 F.3d at 1241). Also, of importance here, "[w]hether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss." Id. at 226.

### 2. The Application

#### a. Adverse Employment Action

In the present case, the parties do not dispute — nor could they in light of the binding case law described above — that the Defendant's decision to terminate the Plaintiff constitutes an adverse employment action that satisfies the first element of a Title VII discrimination claim. (See the Sunbelt Defs.' Reply Mem. of Law at 3–4; the On Site Defs.' Reply Mem. of Law at 5–6; the Pl.'s Cross Mot. at 12.)

However, the parties dispute whether other actions alleged in the PAC constitute independent adverse employment actions that can form the basis of a discrimination claim. Specifically, the Plaintiff contends that the Defendants' decision to reassign her desk from the

first floor to the second floor and their decision to allegedly strip her of her job responsibilities over daily reports both constituted independent adverse actions.  (See the Pl.'s Reply Mem. of Law at 4–5.)

The Defendants dispute that either of these alleged acts constitute adverse employment actions.  (See the Sunbelt Defs.' Reply Mem. of Law at 3–4; the On Site Defs.' Reply Mem. of Law at 5–6.)  The Court agrees.

With regard to the relocation of the Plaintiff's desk, the PAC states that in May or June 2014, after the Plaintiff complained to Kyle Horgan about the alleged discriminatory acts of the Defendants, "her desk was relocated to the upstairs floor, isolated from all employees despite her responsibility to oversee operations."  (PAC at ¶ 108.)

As noted above, to plausibly establish an adverse employment action, the Plaintiff must allege she suffered a "material loss of benefits, significantly diminished material responsibilities, or other indices" as result of the relocation of her desk.  Terry v. Ashcroft, 336 F.3d at 1380 (internal quotation marks and citation omitted).  There are no such allegations in the PAC. Rather, as alleged, the relocation of her desk appears to be nothing more than an inconvenience. See Vega, 801 F.3d at 85 ("'An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.'") (quoting Terry, 336 F.3d at 138).

Therefore, the Court finds that the Defendants' alleged decision to relocate the Plaintiff's desk, standing alone, does not constitute an adverse employment action.  See Carpenter, 2016 WL 4059353 at *7 ("The Court concludes that all of the potentially negative consequences set forth in Plaintiff's memo in opposition to the motion to dismiss are highly speculative; and regardless, these consequences were not alleged in the SAC. Thus, Plaintiff fails to allege an

adverse action based on a disproportionately heavy workload, vis-à -vis the order to leave Headquarters.").

Similarly, the Plaintiff contends that in May or June 2014, the Defendants stripped her of her supervisory responsibilities over daily reports.  (PAC at ¶¶ 98, 113.)  However, the PAC does not offer any allegations suggesting that "reviewing daily reports" was a material part of the Plaintiff's job.  Indeed, to the contrary, according to the PAC, reviewing daily reports was one of many duties that the Plaintiff was responsible for, including among others, applying company policy; ensuring that the PC 104 staff yard was presentable; and approving weekly sales plans and contract plans.  (Id. at ¶ 56.)  Under these circumstances, the Court cannot plausibly conclude that the fact, even if true, that the Defendants stripped the Plaintiff of her responsibility over "daily reports" constituted a material adverse change in the terms and conditions of employment.  See Littlejohn, 795 F.3d 297, 312 n.10 (finding the defendant's decision to exclude the plaintiff from meetings involving a merger did not constitute an adverse action because it did not "significantly diminish" the plaintiff's responsibilities).

In her legal memorandum, the Plaintiff cites to two prior decision of this court:  Scafidi v. Baldwin Union Free Sch. Dist., 295 F. Supp. 2d 235 (E.D.N.Y. 2003); and Mendelsohn v. Univ. Hosp., 178 F. Supp. 2d 323 (E.D.N.Y. 2002).  In both of those cases, this court found that the plaintiffs sufficiently pled adverse employment actions for the purpose of *retaliation* claims, not *discrimination* claims.  See Scafidi, 295 F. Supp. 2d at 238–39 (finding that a school district's decision to reassign a disabled plaintiff to an inconvenient location, together with other allegations that she was assigned extra work and denied access to clerical staff, were "sufficient to qualify as adverse employment actions to sustain a retaliation claim"); Mendelsohn, 178 F.

Supp. 2d at 330 (finding that the reduction of the plaintiff's teaching responsibilities could plausibly satisfy the adverse employment action element of a retaliation claim).

However, as described in more detail below, the definition of adverse employment action for Title VII retaliation claims "covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII[.]" See Vega, 801 F.3d at 90. Thus, the Court finds that Mendelsohn and Scafidi do not support the Plaintiff's contention that the Defendants' alleged actions of relocating her desk and taking away her responsibility over daily reports plausibly establish an adverse employment action for the purpose of a *discrimination* claim.

Accordingly, the only adverse employment action alleged in the PAC is the Plaintiff's termination. However, the Court notes that even if the Plaintiff's other allegations of discrimination do not independently constitute adverse employment actions, they may provide relevant background evidence regarding the second factor of a gender discrimination claim, namely whether the Plaintiff's gender was a motivating factor in the Defendants' decision to fire her. See Vega, 801 F.3d at 88 ("Vega's other allegations of discrimination, even if they do not independently constitute adverse employment actions, provide 'relevant background evidence' by shedding light on Defendant's motivation and thus bolster his claim that Defendants treated him differently because of his ethnicity.") (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 112, S. Ct. 2061, 153 L. Ed. 2d 106 (2002)).

### b. The Motiving Factor

The Court finds that the Plaintiff has satisfied the minimal showing required at this motion to dismiss stage to plausibly allege that the Defendant's decision to terminate her employment on July 18, 2014 was motivated at least in part by a discriminatory reason.

26

The Court acknowledges that PAC is not a model of clarity. It is loosely organized, not in strict chronological order, and does not contain specific dates for every allegation of discrimination. That said, when pieced together, the Court finds that the allegations in the PAC create a "mosaic" of facts, which if true, give rise to a plausible inference that the Defendants were motivated by gender bias. See Vega, 801 F.3d at 87 ("A plaintiff may prove discrimination indirectly . . . by otherwise creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination.") (quoting Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir. 1998)).

In particular, the PAC alleges that from May to June 2014, four of the six female employees working within PC 104, the Plaintiff's department, were terminated and replaced with men, at least one of whom, Joesph Domaratius, had less seniority and was paid less than Rosemary Maiello, the woman who he replaced. (See PAC at ¶¶ 61–68.) Furthermore, allegedly no men were fired during this same period. (Id. at ¶ 71.) Subsequently, on June 20, 2014, Mike French informed the Plaintiff that her employment would be terminated, effective July 18, 2014. (Id. at ¶ 114.) Thus, from May 2014 to June 2014, Defendants allegedly terminated five of the six women in the Plaintiff's department and none of the men in that department.

The Second Circuit has stated that "[t]he fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial *prima facie* stage of the Title VII analysis, including at the pleading stage." Littlejohn, 795 F.3d at 313. Thus, by themselves, these allegations could give rise an inference that the Plaintiff's termination was motivated by gender bias. See id. (finding that a complaint plausibly stated a discrimination claim based on allegation that the plaintiff, an African American, was replaced by a white employee who was less qualified).

In addition, the PAC alleges that in May 2014, the Plaintiff met with Mike French and Patrick French, and during the meeting, they told the Plaintiff that the position of Assistant Manager was too powerful for women and suggested that she step down to an administrative position. (PAC at ¶¶ 87–88.) In response to complaint from the Plaintiff about the meeting, Kyle Horgan allegedly told the Plaintiff that she was "being too aggressive and overacting" and suggested that the Plaintiff "should assume the submissive role expected of females and play nicely within the boys' club." (Id. at ¶ 100.) Further, during a trade show at some point prior to her termination, Mike French allegedly told the Plaintiff that he was "disgust[ed] with the idea that one of [Sunbelt's] clients could have a female top executive running the company." (Id. at ¶ 115.)

Thus, according to the PAC, in the weeks prior to June 20, 2014, when the Defendants gave the Plaintiff notice of her termination, at least three of the four executives at Sunbelt and On Site who were allegedly involved in the decision to terminate the Plaintiff's employment, made comments to the Plaintiff that overtly suggested that they were biased against female employees. Here too, standing alone, courts have found these types of allegations sufficient to satisfy the minimal pleading burden for discrimination claims at the motion to dismiss stage. See Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996) ("The circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus."); Yang v. Dep't of Educ. of the City of New York, No. 14CV7037 (SLT) (RLM), 2016 WL 4028131, at *7–8 (E.D.N.Y. July 26, 2016) (finding that frequent comments made by a plaintiff's supervisor pointing out that the plaintiff was Chinese were sufficient to give rise an inference of national origin discrimination at the motion to dismiss stage).

Clearly, then, when viewed together, the Plaintiff's allegations of Sunbelt's alleged disparate treatment of female employees in PC 104, and of the discriminatory comments made by three of the Plaintiff's supervisors close-in-time to her termination, give rise to a plausible inference of gender discrimination on the part of the Corporate Defendants.  See Vega, 801 F.3d at 88 (finding that the allegation that a school district assigned a teacher more Hispanic students than his non-Hispanic colleagues, together with allegations that the district posted a University of Puerto Rico banner outside of his office and attempted to transfer him to a Hispanic school, were sufficient to state a race discrimination claim).

The Court does not find that the Defendants' arguments are to the contrary.  First, the Sunbelt Defendants assert that the allegations in the PAC fail to plausibly give rise to an inference that her termination was discriminatory because the Plaintiff relies on her own "subjective interpretations" of the Defendants' comments.  (See the Sunbelt Defs.' Mot. to Dismiss at 9; the Sunbelt Defs.' Reply Mem. of Law at 4–5.)

That is not the case.  The comments by the Plaintiffs' supervisors prior to her termination, objectively suggest gender bias because they explicilty refer to the supposed beliefs of Mike French, Patrick French, and Kyle Horgan that female employees were not qualified to be management employees because of their gender.  Thus, the Court finds that their comments plausibly give rise to an inference of gender discrimination, irrespective of the Plaintiff's subjective feelings about those remarks.  See Yang 2016 WL 4028131 at *7 (finding that frequent derogatory comments about the plaintiff's Chinese accent could be viewed as reflecting animus against the plaintiff on account of her national origin).

Next, the Sunbelt Defendants contend that the Plaintiff's allegations of the Defendants' alleged disparate treatment of female employees fail to state a plausible claim of discrimination

because the Plaintiff does not identify a single appropriate comparator. (See the Sunbelt Defs.' Mot. to Dismiss at 9.) Again, the Court disagrees.

To establish an inference of a disparate treatment, "a plaintiff must allege that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). Employees are similarly situated if they are "'subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's.'" Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999) (quoting Mazzella v. RCA Global Communications, Inc., 642 F.Supp. 1531, 1547 (S.D.N.Y. 1986)). Ordinarily, "'[w]hether two employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss.'" Id. (citation omitted) (alteration in original).

For example, in Brown v. Daikin Am. Inc., *supra*, the Second Circuit found that a complaint plausibly alleged that Japanese employees were similarly situated to the plaintiff, who was not Japanese, based on the fact that they shared a supervisor and therefore, presumably "were subject to the same performance evaluation and disciplinary standards." 756 F.3d at 230. Thus, the circuit court found that the allegation that the defendant fired the plaintiff but did not fire any of the Japanese employees in the plaintiff's department was sufficient to plausibly allege a national origin or race discrimination claim. See id.

Similarly, here, as noted above, the PAC alleges that the Defendants gave the responsibilities of Rosemary Maiello and Inez Monello, two of the six female employees in PC 104, to Joseph Domaratius, a male employee who appears to have also worked in PC 104 and was less senior to them. Thus, at this early stage of the litigation, construing all reasonable

inferences in favor of the Plaintiff, Domaratius appears to have been subject the same disciplinary standards as Maiello and Monello and was therefore, similarly situated to them.

Furthermore, even if the allegations of disparate treatment were not sufficient by themselves, when viewed together with the comments of the Plaintiff's supervisors, the Court finds that the allegations in the PAC could plausibly give rise to an inference of discrimination. See Vega, 801 F.3d at 88 (noting that although "[n]one of Vega's other claims plausibly state a claim on their own, . . . they help create context for his discrimination claim.").

For these reasons, the Court concludes that the PAC plausibly alleges that the Plaintiff's gender was a motivating factor in the Defendants' decision to terminate her employment.

### c. The Single Employer Doctrine

According to the PAC, the Plaintiff was employed by On Site from 2001 to April 2014. However, in April 2014, Sunbelt acquired On Site, and Sunbelt subsequently hired the Plaintiff as an Assistant Manager. (See PAC at ¶ 49.) Ultimately, Sunbelt terminated the Plaintiff's employment, effective as of July 18, 2014. (Id. at ¶ 116.)

The On Site Defendants contend that because the Plaintiff was terminated by Sunbelt, not by On Site, On Site cannot be held liable for any discrimination claims arising from the Plaintiff's termination. (See the On Site Defs.' Reply Mem. of Law at 4–11.)

In response, the Plaintiff contends that On Site may be held liable for the post-acquisition acts of Sunbelt under the single employer doctrine because On Site continued to play **a** role in the personnel decisions and the operations of Sun Belt following the acquisition. (See the Pl.'s Mot. to Amend at 8–10.) The Court agrees.

As discussed, *supra*, the single employer test contains four factors: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common

ownership or financial control.  See Cook, 69 F.3d at 1240.  "Although no one factor is determinative . . . control of labor relations is the central concern."  Murray, 74 F.3d at 404.

For example, in Brown v. Daikin Am. Inc., *supra*, at issue was whether a parent company could be held liable for the alleged discriminatory decision of its subsidiary to terminate the plaintiff's employment.  See id. at 227. The Second Circuit found the plaintiff plausibly alleged that the parent and subsidiary were a single employer for purposes of Title VII based on allegations that the parent company closely directed the operations of the subsidiary; approved all significant actions of the subsidiary; and prohibited the subsidiary from reassigning or discharging employees.  Id. at 228.  In so doing, the circuit court acknowledged that the plaintiff did not plead facts suggesting that the parent company had "significant responsibility" over the subsidiary's labor relations, had common management, nor participated directly in the subsidiary's decision to fire the plaintiff.  Id. at 228.  Nevertheless, the court found that the control that the parent was alleged to have exercised over its subsidiary's employment actions was adequate to pass Rule 12(b)(6) muster.  Id.; see also Christiansen v. Omnicom Grp., Inc., No. 15 CIV. 3440 (KPF), 2016 WL 951581, at *4 (S.D.N.Y. Mar. 9, 2016) (finding that a parent could be held liable for the discriminatory acts of a subsidiary under the single employer doctrine based on allegations that the parent exercised extensive control over the subsidiary's "operations and personnel decisions"; controlled the subsidiary's healthcare and retirement benefits; and promulgated the subsidiary's employment handbook).

Similarly, in this case, the PAC alleges that following Sunbelt's April 2014 acquisition, On Site continued to "play a role in the personnel decisions of Sunbelt employees."  (Id. at ¶ 59.) Also following the acquisition, On Site kept paying union dues for all of its former employees, as well as unemployment and health benefits for certain employees.  (Id.)

The Court recognizes that the PAC, like the complaint at issue in <u>Brown</u>, is vague on how much authority On Site exercised over personnel matters. Likewise, the PAC does not specify whether the two companies had common management or ownership, nor how integrated their operations were. However, at this stage of the litigation, the Court finds that the allegations, construed as true, suggest that On Site played a sufficient role in the personnel matters of Sunbelt to satisfy the single employer test. <u>See</u> <u>Christiansen</u>, 2016 WL 951581 at *4 ("It is entirely possible that discovery will reveal an insufficient degree of integration for Omnicom and DDB to fairly be called a 'single employer'; at this stage in the litigation, however, Plaintiff has alleged sufficient facts to establish employment discrimination liability against Omnicom as part of an integrated enterprise with his direct employer, DDB."); <u>Zaffuto v. Peregrine Health Mgmt.</u>, 280 F.R.D. 96, 101 (W.D.N.Y. 2012) ("Given this evidence, it is simply impossible to determine, on this record, whether plaintiff continued to be, or ceased to be employed by Peregrine Health after March 6, 2009. A fuller factual record may enable such a determination to be made at some later time, but at this point, defendant's motion to dismiss on this ground must be denied.").

In sum, the Court finds that the PAC plausibly alleges a Title VII gender discrimination claim against both On Site and Sunbelt.

**E. As to the Retaliation Claim**

**1. The Legal Standard**

In order to present a *prima facie* case of retaliation under Title VII, a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find:

> [1] that she 'engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (quoting Sumner v. United States Postal Service, 899 F.2d 203, 208–09 (2d Cir. 1990)).  However, as with the Title VII discrimination claims, "the allegations in the complaint need only give plausible support to the reduced *prima facie* requirements that arise under McDonnell Douglas in the initial phase of a Title VII litigation." Littlejohn, 795 F.3d at 316.

Here, the parties primarily dispute the third and fourth factors.  With respect to the third factor, "[t]he Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Vega, 801 F.3d at 90 (quoting Burlington N., 548 U.S. at 57, 126 S.Ct. 2405).  As noted earlier, "[t]his definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: [T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment."  Id. (citation and internal quotation marks omitted).

The inquiry into whether the actions of an employer could dissuade a reasonable worker from making a charge of discrimination is objective and context-specific.  See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 69, 126 S. Ct. at 2415 ("We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'") (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998)).

With regard to causation, "a plaintiff must plausibly plead a connection between the act and his engagement in protected activity." <u>Vega</u>, 801 F.3d at 90. "Unlike Title VII discrimination claims, . . . for an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." <u>Vega</u>, 801 F.3d at 90. That is, "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." <u>Zann Kwan v. Andalex Grp. LLC</u>, 737 F.3d 834, 845 (2d Cir. 2013) (citing <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2526, 186 L. Ed. 2d 503 (2013)).

"A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" <u>Littlejohn</u>, 795 F.3d at 319 (quoting <u>Gordon v. N.Y.C. Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000)).

The Second Circuit "has not drawn a bright line defining, for the purposes of a *prima facie* case, the outer limits beyond which a temporal relationship is too attenuated to establish causation." <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 110 (2d Cir. 2010). Thus, for example, this Circuit has previously held that "five months is not too long to find the causal relationship." <u>Id.</u> (citing <u>Gorman-Bakos v. Cornell Coop. Extension of Schenectady County</u>, 252 F.3d 545, 554 (2d Cir. 2001)).

Of course, like many aspects of causation in the Title VII context, the inquiry is dependent on the relevant circumstances of the case. For example, in <u>Vega</u>, the Second Circuit

found that the temporal proximity of several months between the plaintiff's filing of an EEOC charge and the defendant's alleged adverse employments actions was sufficient to infer a retaliatory purpose on the part of the defendant, particularly when considering all of the defendants' alleged acts together. Vega, 801 F.3d at 92 ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to punish Vega for complaining of discrimination."); Carlson v. CSX Transp., Inc., 758 F.3d 819, 829 (7th Cir. 2014) ("In this case, Carlson has alleged that the resolution of her 2007 lawsuit in 2009 sparked animosity right away and that all of her attempts to advance at CSX since then have been thwarted. She has described an ongoing campaign of retaliation, and her claims must be viewed through that lens.")

### 2. The Application

Based on these standards, the Court also finds that the allegations in the PAC sufficiently allege a Title VII retaliation claim against the Corporate Defendants.

According to the PAC, in May 2014, the Plaintiff met with Mike and Patrick French, two of her supervisors. (PAC at ¶ 87.) During the meeting, they allegedly told her that there was no room for female managers at the company and suggested that she step down from her Assistant Manager title to an administrative position because of her gender. (Id. at ¶ 88.) Following the meeting, at some point in May or June 2014, the Plaintiff allegedly complained to Kyle Horgan about the comments made by Mike and Patrick French. (Id. at ¶ 98.)

Following that meeting, the Defendants allegedly decided to relocate the Plaintiff's desk from the first floor of Sunbelt's office, where the workers who she supervised were located, to the second floor, which was allegedly isolated from those workers. (Id. at ¶ 108.) At some point during this period, the Defendants allegedly told the Plaintiff not to handle "the daily reports,"

which she had previously been in charge of reviewing.  (Id. at ¶ 113.)  Mike French and Patrick French also "regularly taunted and humiliated the Plaintiff;" ignored her calls; and assigned ring tones to her phone number so that when she called them, their phones would emit the sounds of missiles, old car horns, and dogs barking.  (Id. at ¶ 109–113.)  Finally, on June 20, 2014, Mike French and Patrick French met with the Plaintiff and told her that her last day of work would be July 18, 2014.  (Id. at ¶ 114.)

Based on these allegations, the parties apparently agree that as alleged, the Plaintiff engaged in protected activity when in May or June 2014, she complained to Kyle Horgan.  They also agree that the Plaintiffs' termination constitutes an adverse employment action.

However, the Sun Belt Defendants argue that the other actions identified by the Plaintiff following her meeting with Kyle Horgan do not constitute adverse employment actions for purposes of retaliation.  (See the Sun Belt Defs.' Reply Mem. of Law at 6–7.)  They further assert that the PAC fails to plead the facts necessary to establish that a retaliatory motive was a "but for" cause of the Defendants' decision to terminate her employment.  (Id. at 7.)  Again, the Court disagrees.

Allegedly, the Plaintiff complained to Kyle Horgan in May or June 2014 and was given a notice of termination on June 20, 2014, which was, at most, two months later.  As noted above, courts in this Circuit have found that equivalent gaps of time to be sufficient to plausibly infer the requisite causation for retaliation claims.  See Vega, 801 F.3d at 92 (finding that allegations that the plaintiff engaged in protected activities and then suffered adverse employments action several months later were sufficient to plausibly establish causation for a Title VII retaliation claim); Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) ("[W]e find that the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by

officers, one of whom (Surber) was a defendant in the prior lawsuit, is sufficient to support an inference of a causal connection."); McDowell v. N. Shore-Long Island Jewish Health Sys., Inc., 788 F. Supp. 2d 78, 82 (E.D.N.Y. 2011) (Spatt, J) ("While some courts within this Circuit have held that a three month gap is insufficient to show a causal connection, others have found that a separation of as much as eight months will permit an inference of causation.").

Thus, based solely on the alleged temporal proximity between when the Plaintiff engaged protected activity and when she was given a notice of termination, the Court finds it plausible to infer a sufficient causal connection between the two events so as to state a retaliation claim.

Furthermore, according to the PAC, immediately after the Plaintiff met with Kyle Horgan to complain about Mike and Patrick French, the two of them verbally harassed her; relocated her desk so that she would be isolated from her co-workers; and took away at least one of her job responsibilities. Even assuming *arguendo* that none of these actions independently constitutes an adverse employment action, taken together, "they plausibly paint a mosaic of retaliation and an intent to punish [the Plaintiff] for complaining of discrimination." Vega, 801 F.3d at 92. Thus, viewing the totality of allegations, an inference of a retaliatory motive on the part of the Defendants in deciding to terminate the Plaintiff becomes even more plausible.

The On Site Defendants contend that even if the PAC states a plausible retaliation claim against Sunbelt, On Site cannot be held liable for that claim because On Site did not employ the Plaintiff in May 2014, when the Plaintiff allegedly complained to Kyle Horgan about the Defendants' alleged discriminatory acts, or on June 20, 2014, when the Plaintiff received notice of her termination. (See the On Site Defs.' Mem.of Law at 16–18.)

However, the "single employer" doctrine, described *supra*, also applies to Title VII retaliation claims. Thus, for the reasons already discussed above with regard to the Title VII

discrimination claim against On Site, the Court finds that the PAC plausibly alleges that On Site and Sunbelt are a "single employer" under Title VII, and by extension, can both be held liable for the alleged retaliatory acts of Sunbelt employees committed against the Plaintiff.

For these reasons, the Court finds that the PAC plausibly alleges a Title VII retaliation claim against On Site and Sunbelt.

## F. As to the Hostile Work Environment Claim

### 1. The Legal Standard

"To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive — that is, . . . creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's sex.'" Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (quoting Gregory v. Daly, 243 F.3d 687, 691–92 (2d Cir. 2001)).

To show that conduct was objectively severe or pervasive, a plaintiff '"must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment."' Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)). In making a determination as to the objective severity or pervasiveness of challenged conduct, courts consider "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance.'" Littlejohn, 795 F.3d at 321 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993)).

"Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Patane, 508 F.3d at 113 (quoting Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)). In the Rule 12(b)(6) context, the Second Circuit has "repeatedly cautioned against setting the bar too high" in this context. Id. (internal quotation marks and citation omitted).

As relevant here, "a plaintiff need only allege that she suffered a hostile work environment because of her gender, not that all of the offensive conduct was specifically aimed at her." Id. at 114. Thus, for example, in Patane v. Clark, supra, the Second Circuit found that allegations about the harassment of employees other than the plaintiff, as well as the presence of pornography in the workplace, to support a plausible claim for a hostile work environment even though some of the conduct was not necessarily directly aimed at the plaintiff. 508 F.3d at 114; see also McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 85 (2d Cir. 2010) ("[T]hese incidents must be considered alongside the other comments, only some of which I mentioned above, that were not directed to or about McGullam, but also contributed to a work environment that was hostile to women.").

## 2. The Application

Applying these standards here, the Court finds that the Plaintiff has plausibly alleged a claim for hostile work environment. According to the PAC, Patrick French and other management employees "repeatedly propositioned female employees and attempted to engage in sexual relations during and outside of company hours[.]" (PAC ¶¶ at 46.) Irvin L. French and

Mike French also "repeated[ly]" engaged in open conversations, presumably heard by other employees, about their extramarital affairs. (Id.) Other management employees also apparently repeatedly made statements suggesting that a woman's place was behind that of a man. (Id. at ¶ 35.)

Construed as true, the Court finds that a reasonable factfinder could conclude that these frequent comments evidencing a sexually explicit subject matter and a general bias against women contributed to a hostile work environment. See Ingrassia v. Health & Hosp. Corp., 130 F. Supp. 3d 709, 722 (E.D.N.Y. 2015) ("Plaintiff alleges that she was subjected to repeated comments about her gender and her age from two different supervisors, and further alleges that one supervisor sexually harassed her by grabbing himself in the groin in Plaintiff's plain view. . . While such allegations may not necessarily rise to the level of a *prima facie* case of hostile work environment, they suffice to give Defendant fair notice of Plaintiff's claim.").

In addition, the Plaintiff alleges that on one occasion, Irvin L. French ordered female strippers to the Defendants' office during company hours. (PAC at ¶ 46.) Further, management employees apparently viewed pornographic materials in the office. (Id.) As an example, the PAC states that in April 2014, Joe Meola told the Plaintiff that On Site's server "could not be salvaged because Mike French frequently downloaded pornography from the internet." (Id. at ¶ 52.)

The Second Circuit has "specifically recognized that the mere presence of pornography in a workplace can alter the 'status' of women therein and is relevant to assessing the objective hostility of the environment." Patane, 508 F.3d at 114 (citing Wolak v. Spucci, 217 F.3d 157, 160–61 (2d Cir. 2000) ("Even if a woman's out-of-work sexual experiences were such that she could perhaps be expected to suffer less harm from viewing run-of-the-mill pornographic images

displayed in the office, pornography might still alter her status in the workplace, causing injury, regardless of the trauma inflicted by the pornographic images alone.")).

Accordingly, although somewhat vague, the Court finds that a reasonable jury could easily conclude that the allegations that the Plaintiff's supervisors ordered strippers to the company office and repeatedly viewed pornography at work, even when viewed in isolation, were objectively severe and created an environment that was hostile toward women. See Torres v. Pisano, 116 F.3d 625, 631 (2d Cir.1997) (concluding that "general allegations of constant abuse" create a jury question as to severity and pervasiveness "even in the absence of specific details about each incident").

Finally, the Plaintiff alleges that in April 2014, after the Plaintiff was promoted to the title of Assistant Manager, Mike French, Patrick French, and Kyle Horgan made comments to the Plaintiff, described above, suggesting that female employees, like the Plaintiff, should not hold management positions because of their gender. They also apparently ignored the Plaintiff's complaints of gender discrimination and repeatedly belittled her in front of other employees. (See PAC at ¶¶ 88, 92, 100, 115.)

Both the Onsite Defendants and the Sunbelt Defendants argue that these comments represent stray remarks that do not qualify as severe and pervasive or rise to the level required to create a hostile work environment. (See the Sunbelt Defs.' Reply Mem. of Law at 5–6; On Site Defs.' Reply Mem. of Law at 17–18.)

While that may be true in isolation, when these comments are viewed through the prism of the other allegations of sexually inappropriate behavior on the part of the Plaintiff's supervisors, they could reasonably take on a more sinister meaning that contributed to an overall environment of gender hostility. See Terry, 336 F.3d at 148 ("In determining whether a hostile

environment exists, we must look at the 'totality of the circumstances.'") (quoting <u>Richardson v. New York State Dep't of Corr. Serv.</u>, 180 F.3d 426, 437 (2d Cir. 1999)).

For these reasons, the Court finds that the Plaintiffs have also plausibly alleged a Title VII hostile environment claim against On Site and Sunbelt.

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss solely with respect to the New York State law claims and the Title VII claims against the Individual Defendants. Further, the Court grants the Plaintiffs' motion to file an amended complaint that is limited to three claims against the Corporate Defendants under Title VII for gender discrimination, retaliation, and hostile work environment.

Within 30 days of the date of this Order, the Plaintiff is directed to file an amended complaint consistent with this Order. That is, the Plaintiff may *not* include in the amended pleading New York State law claims, or Title VII claims against the Individual Defendants. Rather, the amended complaint should only include the three above-mentioned Title VII claims against the Corporate Defendants.

The case is referred to United States Magistrate Judge Gary R. Brown for discovery. The Clerk of the Court is directed to terminate docket entries 10, 17, and 23.

Dated: Central Islip, New York.
August 15, 2016

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge